# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| HAROLD STEPHEN DYKES, | ) |
| Plaintiff, | ) |
| v. | ) No. 4:07-CV-733 CAS |
| JOETTA MITCHELL, et al., | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on a motion for summary judgment filed by defendants Susan Singer, M.D., and Correctional Medical Services, Inc. ("CMS"). Plaintiff Harold Stephen Dykes, a Missouri prisoner, brings this action pursuant to 42 U.S.C. § 1983 through appointed counsel, alleging violations of his civil rights while he was held as a pretrial detainee at the St. Louis City Justice Center ("CJC"). Plaintiff opposes the motion for summary judgment and it is fully briefed. For the following reasons, the motion will be granted in all respects.

**Legal Standard**

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor).

Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. See Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.

**Facts**

Plaintiff became incarcerated at CJC on April 26, 2006. Defendant Singer is a medical doctor licensed to practice medicine in the State of Missouri and is employed by CMS. Dr. Singer provides

medical services to individuals confined at CJC. At the time plaintiff was admitted to CJC, he provided prison medical staff with his medical history which included asthma, a serious neck injury in 1991, and back surgery for a herniated disc in 2001. Plaintiff broke his neck in an automobile accident in 1991, had surgery for the neck injury, and received disability benefits for his neck condition from 1991 to 2004. Plaintiff was treated for another neck injury in 1998 as a result of a bus accident. Plaintiff was treated by numerous healthcare providers for his pre-existing neck and back injuries prior to his arrival at CJC, including for headaches and migraines, and has taken medication for his neck and back problems since they began. Plaintiff suffered headaches and migraines on and off since he broke his neck.

Plaintiff filed medical requests to be seen by a doctor for pain and stiffness as a result of his prior broken neck and two neurosurgeries, including migraine headaches and severe neck pain, on April 28, 2006, May 10, 2006, May 25, 2006, July 1, 2006, and July 7, 2006. In December 2006, plaintiff asked CJC mental health staff for a psychological exam, the Minnesota Multiphasic Personality Inventory test. From May 2006 through February 2007, Dr. Singer prescribed various medications for plaintiff, including 50 - 100 milligram dosages of pain relievers Ultram and Tylenol, and asthma medication. Prior to February 16, 2007, Dr. Singer treated plaintiff for complaints of chronic neck pain, headaches and chronic asthma, and plaintiff was enrolled in the Chronic Care Clinic for his asthma.

On February 16, 2007, plaintiff was attacked by another pretrial detainee, Arthur Manning, with a weapon later identified as a sock filled with batteries. Manning entered plaintiff's cell and struck him repeatedly in the head with this weapon, including the area of plaintiff's left eye and left ear and his mouth. As a result of the attack, plaintiff suffered multiple lacerations about his head, in

particular in the area of his left eye and left ear, two broken and missing teeth, and a probable concussion.  Plaintiff briefly lost consciousness as a result of the attack.

After the attack, plaintiff was escorted to the CJC medical unit where he was seen by a nurse, Nurse Head.  Nurse Head assessed plaintiff's vital signs, including temperature, respiration and blood pressure.  Nurse Head reported bruising on plaintiff's face, redness and swelling at the left frontal lobe of his forehead, a one-half inch cut inside the left ear lobe and a one-quart inch cut on the middle aspect of his left ear lobe, and missing teeth.  Plaintiff told the nurse that he was dizzy.

The nurse gave plaintiff ice for his forehead, gave him gauze to clean his wounds, submitted referrals for plaintiff to see the dentist and a physician, and ordered a skull x-ray.  Skull x-rays were taken on February 19, 2007 but were "over-penetrated and of very limited diagnostic value."  Defendant Dr. Singer saw plaintiff on February 20, 2007.  Plaintiff complained about, among other things, his left ear, including his hearing and lacerations on the outside of the ear.  Based on Dr. Singer's observations, it looked as though plaintiff had sustained trauma to his head and face.  Dr. Singer assessed plaintiff's head, ears, nose and throat, and his external auditory canal.  Dr. Singer diagnosed head trauma and a concussion.  Dr. Singer ordered an increased dosage of the pain medication plaintiff already took for his preexisting injuries, reordered the skull x-ray, referred plaintiff to the dental department, and said follow up would occur as needed.

Plaintiff was treated by the dentist at CJC on February 23, 2007, June 14, 2007, and October 2, 2007 for his dental needs.

Plaintiff sent medical requests on March 15, 2007, March 26, 2007 and March 31, 2007 complaining of pain in his eye and ear and migraine headaches, and asking for the skull x-ray to be repeated.  Plaintiff saw a nurse on April 4, 2007, and complained among other things that since the

attack he had problems hearing in his left ear and that the sight in his left eye was disturbed. On April 15, 2007, plaintiff sent a medical request asking in part to see a doctor as soon as possible because of hearing and sight problems. On April 16, 2007, plaintiff saw a nurse and complained in part of difficulty hearing out of his left ear and seeing out of his right eye.

Plaintiff filed his original complaint in this matter on April 16, 2007. Neither Dr. Singer nor CMS was named as a defendant in the original complaint.

On April 23, 2007, plaintiff self-declared a medical emergency seeking psychiatric care. Plaintiff saw Dr. Siddiqui, the CJC psychiatrist, on April 23, 2007. Dr. Siddiqui diagnosed plaintiff with an adjustment disorder[1] or malingering.[2] Plaintiff was also seen on May 8, 2007 by a mental health staff member for a number of reported complaints, including nightmares related to the assault by inmate Manning.

On April 27, 2007, plaintiff sent a medical request asking to see a doctor because of, among other things, pain and difficulty hearing in his left ear and difficulty seeing with his left eye. On May 17, 2007, plaintiff sent a medical request to see Dr. Singer. On May 23, 2007, plaintiff saw Dr. Singer during his Chronic Care Clinic visit, as part of ongoing care for plaintiff's asthma condition. During the visit, plaintiff complained to Dr. Singer about problems with his left eye, including a spot that moved in his field of vision and blurry vision. He also complained of a stiff neck and migraine

---

[1]Adjustment disorder is "a group of mental and behavioral disorders in which the development of symptoms is related to the presence of some environmental stressor or life event and is expected to remit when the stress ceases . . . . [The disorder] is indicated by impairment in occupational (including school) functioning, or in usual social activities or relationships with others, or with symptoms that are in excess of a normal or expectable reaction to the stressor." Stedman's Medical Dictionary 525 (27th ed. 2000).

[2]Malingering is defined as, "Feigning illness or disability to escape work, excite sympathy, or gain compensation." Id. at 1058.

5

headaches and told Dr. Singer these problems were related to the February 16, 2007 attack. As of the date of this visit, no additional x-rays had been taken of plaintiff's skull, despite Dr. Singer's direction that the x-rays should be repeated.

Dr. Singer administered a Snellen vision test during this visit, and found plaintiff had 20/30 vision in his right eye and 20/40 vision in his left eye. Dr. Singer concluded the left eye was minimally below normal vision limits and within normal findings for a forty-nine year old individual. Dr. Singer also assessed plaintiff's soft hearing ability in both ears with a finger rub test. Following the May 23, 2007 visit, Dr. Singer entered orders for plaintiff's medications, reordered a skull x-ray, provided plaintiff with Ben-Gay, referred plaintiff for an audiogram to test his hearing, and scheduled a follow-up visit for three months. Dr. Singer did not request additional testing of plaintiff's eye because she believed 20/30 vision in the right eye and 20/40 vision in his left eye was only minimally below normal vision.

Plaintiff was seen by Dr. Siddiqui, the psychiatrist, on June 9, 2007 for complaints of poor appetite, sleepiness, headaches and nightmares. Dr. Siddiqui again diagnosed plaintiff with adjustment disorder or malingering.

Plaintiff did not receive a second skull x-ray until July 2, 2007. At her deposition, Dr. Singer testified she did not know why the second x-ray she had requested had not been taken sooner, "Other than apparently the request form for the x-ray hadn't made it to the x-ray logbook to be done." Singer Dep. at 25. The second skull x-ray did not reveal any fracture of plaintiff's facial bones.

Dr. Singer testified at her deposition that as of July 2007, she thought plaintiff might be malingering, because when she saw him, except for the first visit after the attack by Manning, he "appeared to be quite well and having no difficulty moving or getting around, despite his multiple

6

complaints," Singer Dep. at 38, and that plaintiff might have been motivated by the desire to get ongoing pain medication. Id. at 39. Dr. Singer testified her concerns about malingering could have been based on the psychiatrist's mention of malingering as a possible diagnosis. Id. at 40.

Plaintiff's audiogram was performed at Washington University School of Medicine Department of Otolaryngology on July 9, 2007. The audiogram reported bilateral sensory neural hearing loss, with mild hearing loss in the right ear and mild to moderate hearing loss in the left ear. Testing of the inner ear revealed normal middle ear function in both ears. The audiologist recommended an Ear Nose and Throat ("ENT") physician consultation regarding asymmetrical hearing loss, hearing aides in both ears if medically approved, annual audio testing, and protection against noise.

On the same day plaintiff's audiogram was performed, July 9, 2007, plaintiff filed his pro se motion for permissive joinder of parties, seeking to add Dr. Singer as a party to the instant lawsuit. On July 13, 2007, Dr. Singer submitted a consultation request for plaintiff to see an ENT specialist for an assessment of his bilateral hearing issues.

Plaintiff filed a medical request on July 22, 2007 complaining of pain in his neck, shoulder and arm. Dr. Singer saw plaintiff on July 24, 2007 for his asthma Chronic Care Clinic appointment. During this visit, plaintiff complained of left ear "popping" since the audiogram, pain in his neck, ear and eye, not sleeping well, decreased appetite and light sensitivity. Dr. Singer performed a second Snellen eye exam, which showed plaintiff's right eye at 20/30 and his left eye at 20/70. Dr. Singer examined plaintiff's eyeball and noted some firmness in the left eye. Dr. Singer referred plaintiff for an ophthalmologic examination at the St. Louis University Department of Opthalmology /Anheuser-Busch Eye Institute to rule out glaucoma, either natural or post-traumatic. Dr. Singer also

7

renewed plaintiff's asthma and various medications, and increased his Ultram prescription to 100 mgs. Plaintiff was also seen by mental health staff on July 24, 2007.

On August 1, 2007, plaintiff filed his first amended complaint naming Dr. Singer and CMS as parties defendant in this action. On the same day, Dr. Singer prepared another referral for plaintiff for an opthalmologic exam, which stated in part, "If you can, please comment on whether any changes you find are 'natural' versus likely [secondary to] prior trauma. He's trying to make a case, alleging [decreased] vision due to altercation 2/07." Pl.'s Ex. 19.

Dr. Singer next saw plaintiff on August 22, 2007. Plaintiff requested his nails cut, and complained that he was not receiving his evening medication, his left ear was popping and he had decreased vision. Dr. Singer performed a third Snellen eye exam, which showed improvement in plaintiff's left eye from Dr. Singer's prior exam. A Snellen test is based on the presumption that the patient is providing the physician with truthful or accurate information. Dr. Singer noted that plaintiff's most recent visual improvements showed a marked difference from his prior exam on July 24, 2007.

Plaintiff filed a medical request on September 3, 2007 complaining of numbness in his neck at the base of the skull and increased pain in his left shoulder, and requested to see a neurologist.

On or about September 10, 2007, Dr. Lei Zhuang, an ENT specialist, evaluated plaintiff at the Barnes Jewish Hospital ENT Clinic. Dr. Zhuang assessed plaintiff with asymmetric hearing loss, with left mild to moderate mixed hearing loss, and trauma to the left temporal bone, and recommended a CT scan of the temporal bone to assess middle ear and inner ear anatomy. On September 12, 2007, Dr. Singer requested that plaintiff undergo a CT scan, as recommended by Dr. Zhuang. Plaintiff recalled the ENT's recommended treatment plan was to avoid loud music. Plaintiff

8

does not wear any hearing aides, and has never worn a hearing aide. The ENT advised plaintiff the cause of his hearing loss was undetermined. Plaintiff's medical records indicate that the CT scan of temporal bone was normal. Dr. Zhuang recommended no further care other than a routine annual hearing test.

On September 11, 2007, plaintiff filed a medical request seeking treatment for numbness in his neck at the base of his skull and severe pain in his left shoulder.

Plaintiff was evaluated at the St. Louis University Department of Ophthalmology/ Anheuser-Busch Eye Institute ("SLU") on September 18, 2007. Plaintiff's SLU records report a diagnosis of a probable traumatic optic neuropathy OS. The recommended treatment plan was to give plaintiff a prescription for reading glasses and schedule a follow-up in six months. Plaintiff recalled the ophthalmologist advised plaintiff that glasses would reduce the strain on his "good eye" (the right eye) and that no treatment was recommended for his left eye. Reading glasses are not typically provided to inmates at CJC.

On September 23, 2007, plaintiff filed a medical request for treatment for nerve problems in his shoulder and neck.

Dr. Siddiqui saw plaintiff on September 29, 2007 for his mental health needs.

Dr. Singer saw plaintiff again on October 24, 2007. Plaintiff complained of, among other things, new left arm pain. Dr. Singer evaluated plaintiff's new arm pain and found no obvious atrophy of the upper or lower extremities, his neck was non-tender, his left trapezius muscle was without mass or spasms, and his neurological jerks were all normal and equal. Dr. Singer performed additional neurological tests and noted plaintiff's subjective complaint of parethesias (tingling or funny

9

sensation) in the left upper arm. Dr. Singer found plaintiff's left arm complaints were non-focal or did not follow any specific nerve into his arm.

At that time, Dr. Singer discontinued plaintiff's Ultram prescription because it was no longer available on the medication formulary and also because she found no obvious need for chronic pain treatment. Dr. Singer offered plaintiff an alternative pain medication of Neurontin, commonly used to treat parethesia. Plaintiff rejected the Neurontin.

On October 26, 2007, Dr. Singer consulted with plaintiff's ophthalmologist, Dr. Porter, regarding his findings. Dr. Porter reported that plaintiff's optic neuropathy was not definite and the changes in plaintiff's visual fields were minimal at most and may have been pre-existing. According to Dr. Porter, plaintiff's vision is good enough to drive in Missouri, and prescription-reading glasses would make no difference (or had no relation) to any of plaintiff's optic nerve issues. Dr. Singer concluded that prescription glasses were not medically necessary to treat any possible or inconclusive optic nerve damage.

On November 7, 2007, plaintiff was evaluated by Dr. Hallazago, who is now deceased. Dr. Siddiqui saw plaintiff on November 17, 2007 and December 17, 2007 for plaintiff's mental health concerns.

Dr. Singer saw plaintiff again on January 10, 2008 for complaints of neck pain. On exam, she noted some muscle atrophy along the left arm. Dr. Singer requested a neurology evaluation to determine the cause of the atrophy and diminished strength, but noted on this request the possibility that plaintiff was malingering. Dr. Singer prescribed Ultram to plaintiff to treat his neck complaints. Dr. Singer did not believe a neck x-ray was medically required.

A correctional physician's request for an out-patient referral is received by an out-patient nurse reviewer at CMS. The out-patient nurse reviewer collects information which supports or mitigates the particular request. The out-patient nurse presents the information to a reviewing physician for consideration. Out-patient nurse Kathleen Carver reviewed Dr. Singer's request for a neurological consultation and found that it contained only plaintiff's subjective medical complaints of pain and paresthesia, and lacked objective findings.

The out-patient nurse bases her review of consultation requests on an "InterQual review" computer program used by most insurance companies and hospitals to determine whether a specialist is medically justified. In plaintiff's case, Ms. Carver was not aware of any objective medical complaints, such as atrophy, weakness or uneven gait, which may have supported a neurological consultation. Dr. Singer's request for the neurological consultation was denied because Ms. Carver and Dr. Sands, the Assistant Regional Medical Director, concluded that it contained no objective medical findings, and because of the possibility that plaintiff was malingering.

On February 28, 2008, Dr. Singer examined plaintiff. Plaintiff looked well on exam, but was having difficulty shrugging his left shoulder upward, and the muscle on the left looked smaller than the muscle on the right. There was a question whether plaintiff's left side grip was less strong than his right side grip. Following the February 28, 2008 exam, Dr. Singer submitted a subsequent request for plaintiff to obtain a neurology consultation for his new complaints. Instead, plaintiff was given physical therapy to treat his most recent neck complaints. Plaintiff was evaluated by a physical therapist on March 12, 2008 and March 14, 2008 and provided with exercises (or a Home Exercise Program) to address the atrophy.

On March 14, 2008, Dr. Singer assessed plaintiff's neck, shoulder and arm complaints and requested a cervical spine MR and electromyogram ("EMG") of plaintiff's left arm. The out-patient review nurse noted that the request included objective medical findings. Additional information was requested by the reviewing physician as to (1) determining plaintiff's release date because CJC houses short-term inmate/patients and there is a problem with "back billing" for out-patient care approved before an inmate s release, but obtained after the inmate's release, (2) how long plaintiff's symptoms were present, and (3) whether plaintiff was complying with the Home Exercise Program. The requested information was directed to Dr. Singer for a response.

Plaintiff was transferred from CJC to ERDCC on March 20, 2007 before any MR or EMG testing could be accomplished. Plaintiff has remained confined at ERDCC since his transfer from CJC.

**Discussion**

**A. Defendant Dr. Singer**

Because plaintiff was a pretrial detainee at the relevant times, his constitutional claims based on inadequate medical care arose under the Fourteenth Amendment, but the Eighth Amendment deliberate indifference standard is applied to his claims. See Frentzel v. Boyer, 297 F. App'x 576, 577 (8th Cir. 2008) (citing Hartsfield v. Colburn, 371 F.3d 454, 456-57 (8th Cir. 2004), and Ervin v. Busby, 992 F.2d 147, 150 (8th Cir. 1993) (per curiam)).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious."" Hudson v. McMillian, 503 U.S. 1, 9 (1992). "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison

12

officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Long, 86 F.3d at 765). "Deliberate indifference may be demonstrated . . . by prison doctors who fail to respond to prisoner's serious medical needs." Id. (citing Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)). "Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." Id. (citing Estelle, 429 U.S. at 106).

An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); see also Farmer v. Brennan, 511 U.S. 825 (1994). In a case concerning the deprivation of medical care, a plaintiff must demonstrate that (1) he suffered an objectively serious medical need; and (2) the defendant actually knew of the medical need but was deliberately indifferent to it. See Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir. 2006).

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minnesota Dep't of Corrections, 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman, 114 F.3d at 784). "To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk. Rather, a plaintiff must demonstrate the official actually knew of the risk and deliberately disregarded it." Id. (internal quotation and citations omitted). "The determination that prison officials had actual knowledge of a serious medical need

13

may be inferred from circumstantial evidence or from the very fact that the risk was obvious." Id. at 481-82. "If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may held liable for deliberate indifference." Jones, 512 F.3d at 482. "However, a showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." Pietrafeso v. Lawrence County, S.D., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006)) (quotation marks and brackets omitted).

When a delay in medical treatment is the alleged constitutional deprivation, as in this case, the second element, the objective seriousness of the deprivation, must also be measured "by reference to the effect of delay in treatment." Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (quotation marks and quoted case omitted). As a result, to succeed on a delay in medical treatment claim, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (quotation marks omitted) (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)).

On summary judgment, the plaintiff must offer evidence that a delay in treatment had a detrimental effect. In the absence of such evidence, the plaintiff "fail[s] to raise a genuine issue of fact on an essential element of his claim." Id.; accord Beyerbach, 49 F.3d at 1327. In Beyerbach, the plaintiff sued two prison officers and the prison nurse for delay in treating his broken hand. The district court denied defendants' motion for summary judgment. Beyerbach, 49 F.3d at 1325. The Eighth Circuit Court of Appeals reversed, noting that while a broken hand could be a serious medical need, the inmate failed to present "verifying medical evidence" that the defendants "ignored an acute

14

or escalating situation" or that the "delays adversely affected his prognosis, given the type of injury[.]" Id. at 1326 (quotation marks and quoted cases omitted).

Similarly, the Eighth Circuit has upheld the entry of summary judgment in favor of defendant prison officials where a plaintiff failed to submit verifying medical evidence that a delay in treatment adversely or detrimentally affected the plaintiff's condition or prognosis. In Laughlin, the Eighth Circuit upheld the entry of summary judgment in favor of prison officers and officials who delayed treating the inmate's heart attack where the inmate failed to offer evidence "establishing that any delay in treatment had a detrimental effect." Laughlin, 430 F.3d at 929. See also Dulaney, 132 F.3d at 1243 (affirming summary judgment in favor of defendant prison officials as to plaintiffs Anderson and Allen, where neither plaintiff submitted verifying medical evidence showing that delay in treatment of her acute cardiac condition and chest pain resulted in an adverse effect); Crowley, 109 F.3d at 502 (affirming summary judgment in favor of defendant prison officials when the inmate did not submit verifying medical evidence that the defendants' delay in providing the inmate with sunglasses had an adverse effect on his prognosis).

In the instant case, defendant Dr. Singer moves for summary judgment on plaintiff's claims against her, which are based on Singer's claimed (1) failure to see plaintiff for a period of over three months between mid-February 2007 and May 2007 after diagnosing him with a concussion and requesting a skull x-ray; (2) refusal to refer plaintiff to an ear or eye specialist until after she was named as a defendant in this action;[3] and (3) failure to treat plaintiff's neck injuries with anything

---

[3] The Court notes that the uncontroverted facts indicate Dr. Singer referred plaintiff for an audiogram shortly prior to being named as a defendant in this action.

15

other than pain medication, despite plaintiff's requests for treatment and the deterioration of his condition, until after she was named a defendant in this action.

Dr. Singer states that the undisputed material facts and medical records indicate that she provided plaintiff with "exemplary medical care" before and after the assault, and sought out specialized medical care for each of his medical needs during his period of confinement at CJC. Dr. Singer asserts there is no medical evidence to establish to a reasonable medical certainty the cause of plaintiff's hearing loss or vision condition, or to establish that the assault aggravated plaintiff's chronic pre-existing neck condition. Further, Dr. Singer asserts that plaintiff cannot establish and presents no verifying medical evidence to show that he suffered any detrimental effects to his condition or prognosis as a result of any alleged delays in treatment.

Dr. Singer's motion for summary judgment does not dispute that plaintiff had an objectively serious medical need. As a result, the Court's analysis of the motion focuses on the second part of the Farmer test, the objective seriousness of the deprivation. Plaintiff argues a jury can reasonably infer that the symptoms in his left eye and ear were attributable to the attack by inmate Manning in February 2007, and can also reasonably infer that Dr. Singer was deliberately indifferent to plaintiff's serious medical needs because she did not see him again until May 2007 and had not obtained a viable skull x-ray by that time, despite her diagnosis of blunt trauma to the head and a concussion.

While there is voluminous evidence in the record documenting plaintiff's diagnosis and treatment, plaintiff offers no verifying medical evidence establishing that any delay in treatment had a detrimental effect on his condition or prognosis. Despite plaintiff's arguments concerning reasonable inferences, this is not the kind of case in which the deprivation alleged by plaintiff would be obvious to a layperson. Cf. Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir. 1999) (no

16

verifying medical evidence was necessary to establish the detrimental effects of a delay in refusing diabetes medicine and special diet to a known diabetic). Further, the factual record is undisputed that the eye and ear specialists plaintiff saw recommended only routine treatment, and did not indicate that delay in treatment had worsened his condition or prognosis.[4] Plaintiff did not see a neurologist concerning his neck, arm and shoulder complaints. As a result, verifying medical evidence is needed to support plaintiff's claims. In the absence of such evidence, plaintiff fails to raise a genuine issue of fact on an essential element of his claim in opposition to Dr. Singer's motion for summary judgment. Further, it is clear from the record that plaintiff's medical needs were not disregarded, as he received a significant amount of medical care.

Thus, plaintiff has failed to meet his burden to demonstrate that there is a genuine issue of material fact about whether defendant Singer was deliberately indifferent to his serious medical needs, or that the claimed delays had any detrimental effect on his condition or prognosis. See Laughlin, 430 F.3d at 929. Accordingly, the Court concludes summary judgment should be granted in favor of defendant Singer.

**B. Defendant CMS**

To state a claim against defendant CMS, plaintiff must allege there was a policy, custom, or official action by those who represent official CMS policy, that inflicted an Eighth Amendment injury on him. See Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir. 1993). CMS moves for summary judgment asserting that plaintiff's complaint should be dismissed because it fails to plead

---

[4]As stated above in the Facts section, the eye specialist recommended that plaintiff wear prescription glasses and have a follow-up visit in six months. The ENT (ear) specialist recommended that plaintiff avoid loud music and have an annual hearing test. Further, neither specialist could state with medical certainty that the attack caused plaintiff's eye or ear conditions.

17

or state a § 1983 claim against CMS, and that Section 1983 will not support a claim based on a respondeat superior theory of liability. CMS states that plaintiff has not pleaded or alleged that CMS maintains any policy, practice or custom that is unconstitutional or is the moving force behind plaintiff's claimed injuries or damages, and therefore has not pleaded any facts or claims on which CMS could be liable.

Plaintiff responds that the evidence shows CMS maintains a policy that medical decisions will be made based on the non-medical factor of who will pay for medical treatment if an inmate is released, and this policy is upheld by CMS's Regional Medical Director and implemented in part by its out-patient nurse reviewer. Plaintiff states that when Dr. Singer made a second request for review of plaintiff's neck, arm and shoulder complaints in late 2007, the out-patient review nurse requested additional information, including plaintiff's expected release date, and the nurse testified that the question was relevant because if a patient were released from jail after CMS authorized a medical procedure, an issue could arise where the patient attempts to "back bill" CMS for the procedure even though CMS should no longer be responsible. Plaintiff contends that this evidence is sufficient to permit a jury to find that CMS maintains a policy of making medical decisions based on non-medical factors.

CMS replies that the complaint fails to plead or state a § 1983 claim against it, and that plaintiff cannot allege for the first time, in opposing summary judgment, that CMS maintains an unconstitutional policy of considering non-medical factors in reaching its medical decisions. CMS also asserts that there is no competent evidence to support plaintiff's claim against it, because the evidence shows that each of Dr. Singer's multiple specialist referrals was approved, with the exception of a neurologic consultation. CMS states that the first neurologic referral request was

18

denied because plaintiff did not exhibit objective medical symptoms or need for the consultation and there was a legitimate concern whether plaintiff was malingering, and plaintiff was provided with physical therapy. The second neurologic referral request sought additional information, including whether plaintiff was complying with his prescribed exercise program and how long the condition had existed, and plaintiff was transferred out of CJC before the responsive information was processed.

A review of the complaint shows that plaintiff did not allege CMS had a policy, custom, or official action by those who represent official CMS policy, that inflicted his injuries. Instead, the complaint merely alleges that as a result of the acts and omissions described in the facts section, which did not include any allegations concerning CMS policy, custom or official action, CMS was aware of plaintiff's medical needs, was deliberately indifferent to plaintiff's medical needs, and violated plaintiff's rights under the Eighth and Fourteenth Amendments. In contrast, the Court notes that Count I of the complaint, directed against defendants the City of St. Louis and Eugene Stubblefield, alleges the existence of a widespread custom, practice and policy of delaying medical attention and failing to protect inmates. See Second Amended Complaint, ¶¶ 51-55. Because there is no allegation of a CMS policy, custom or official action by those who represent CMS policy, plaintiff failed to plead a § 1983 claim against CMS. See Sanders, 984 F.2d at 975-76.

Further, plaintiff cannot attempt to assert an unpleaded custom and policy claim against CMS in an effort to stave off summary judgment. A party cannot assert a new theory of his case in an attempt to defend a summary judgment motion, or expand a claim to create a material issue of fact where none existed before. See Sorenson v. First Wisconsin Nat'l Bank of Milwaukee, N.A., 931 F.2d 19, 21 (8th Cir. 1991); Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 288-89 (8th Cir.

19

1988). Because plaintiff has failed to allege a § 1983 claim against CMS, the motion for summary judgment should be granted.

**Conclusion**

For the foregoing reasons, the motion for summary judgment filed by defendants Susan Singer, M.D., and Correctional Medical Services, Inc. should be granted in all respects.

Accordingly,

**IT IS HEREBY ORDERED** that defendants Susan Singer, M.D., and Correctional Medical Services, Inc.'s motion for summary judgment is **GRANTED**. [Doc. 77]

An appropriate partial judgment will accompany this memorandum and order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  27th  day of May, 2009.